1  Mark S. Lee (SBN: 94103)           Kendra L. Orr (SBN: 256729)
2  mark.lee@rimonlaw.com              Kendra.orr@rimonlaw.com
   RIMON, P.C.                        RIMON, P.C.
3  2029 Century Park East, Suite 400N One Embarcadero Center, Suite 400
   Los Angeles, CA   90067           San Francisco, CA   94111
4  Telephone/Facsimile: 310.561.5776 Telephone/Facsimile: 415.683.5472
5  Attorneys for Defendant NIRVANA,
   L.L.C.
6

7              **UNITED STATES DISTRICT COURT**

8             **CENTRAL DISTRICT OF CALIFORNIA**

9
   JOCELYN SUSAN BUNDY, an          | Case No. 2:21-cv-03621-JAK-SK
10 individual,                       |
                                     | **DECLARATIONS OF MARK S. LEE,**
11              Plaintiff,           | **MICHAEL SKREIN, ALEXANDER**
                                     | **KLETT, JOHN SILVA AND JOEL M.**
12      v.                           | **BENNETT IN SUPPORT OF**
                                     | **DEFENDANT NIRVANA, L.L.C.'S**
13                                   | **MOTION FOR ORDERS:**
   NIRVANA, L.L.C. a Washington     |
14 Limited Liability Company; LIVE  | **(1) DISMISSING COMPLAINT FOR**
15 NATION MERCHANDISE LLC, a        |   ***FORUM NON CONVENIENS***
   Delaware Limited Liability Company; |   **(F.R.C.P. 12(B)(3); AND THE**
16 MERCH TRAFFIC LLC, a Delaware    |   **COMMON LAW); AND**
17 Limited Liability Company; SILVA |
   ARTIST MANAGEMENT, LLC, a        | **(2) ALTERNATIVELY, DECLINING**
18 California Limited Liability      |   **SUPPLEMENTAL JURISDICTION**
19 Company,                         |   **OVER ENGLISH AND GERMAN**
                                     |   **COPYRIGHT INFRINGEMENT**
20                                   |   **CLAIMS (28 U.S.C. § 1367(C))**
              Defendants.           |
21                                   | (Filed concurrently with Memorandum of
22                                   |   Points and Authorities in Support
                                     |   Thereof)
23                                   |
24                                   | Date:    October 18, 2021
                                     | Time:    1:30pm
25                                   | Courtroom:  Courtroom 7D
                                     | The Honorable Dale S. Fischer
26
27
28

DECLARATIONS OF MARK S. LEE, MICHAEL SKREIN, ALEX KLETT, JOHN SILVA  AND JOEL M.
BENNETT IN SUPPORT OF NIRVANA'S MOTION TO DISMISS

# DECLARATION OF MARK S. LEE

I, Mark S. Lee, declare:

1.      I am a lawyer admitted to practice before of this Court, and am a partner at Rimon, PC, counsel for Nirvana, L.L.C. ("Nirvana") in this matter.  I have personal knowledge of the following facts except where otherwise indicated, and if called upon as a witness, I could and would competently testify thereto.

2.      I authored the three letters that are attached as Exhibits 6, 8 and 10 to the Complaint in this action.   Attached as Exhibit 1 to the Complaint's Exhibit 6 is a copy of the title page and copyright notice page from a paperback edition of the Dorothy L. Sayers' translation of volume 1 of *Divine Comedy, entitled "Hell,"* published by Penguin Classics that I purchased from Amazon.com.   I printed out the Amazon.com listing for that book, and a true and correct printout is attached as Exhibit 3.  Under "Product Details," that page identifies the publisher and edition of this book as "Penguin Classics, Reprint edition (June 30, 1950.)."

3.      The Copyright Office of the United States maintains a website that, among other things, provides public access to a computer database of records filed with the Copyright Office since January 1, 1978.  See https://copyright.gov/; https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?DB=local&PAGE=First.  I personally searched that database several times in late February 2021, to see if I could discover any documents recorded with the Copyright Office since January 1, 1978 concerning Dorothy L. Sayers' translation of volume 1 of the *Divine Comedy*. Those searches revealed no recorded documents concerning that work.

4.      I also searched that Copyright Office database to see if I could discover any documents that referred to Mr. C.W. Scott-Giles.  That search revealed no recorded document concerning any work in which copyright was claimed by Mr. Scott-Giles.  There was one reference to Mr. Scott-Giles, but that involved a work entitled "Whimsey family: a fragmentary history compiled from correspondence with Dorothy L. Sayers/ by C.W. Scott-Giles."  Copyright in that work was claimed by Mr.

2

Anthony Fleming, who I am informed and believe was the son and sole heir of Dorothy L. Sayers and died in 1984.  A true and correct printout of that page from the Copyright Office catalog is attached as Exhibit 8.  A search of that same database revealed that Mr. Fleming filed a number of other documents with the Copyright Office relating to Dorothy L. Sayers' works, but none of them involved volume 1 of the *Divine Comedy*.  A true and correct copy of a printout of the works involving Mr. Anthony that are referenced in the Copyright Office's computer database is attached as Exhibit 9.

5.      Since the Copyright Office's online database does not include information on documents registered or recorded with the Copyright Office before 1978, while the *Divine Comedy* was first published in 1949, I ordered a full copyright search for volume 1 of the *Divine Comedy* be conducted in all of the Copyright Offices' records, including pre-1978 records, from Corsearch, a company that conducts such searches in the U.S. and internationally on a commercial basis.  See https://portal.corsearch.com/cgp/Products_Services/CopyrightTitle#HM.  On or about March 1, 2021, I received a report from Corsearch which stated, "We find no record of copyright registration or subsequent renewal in connection with this work."  A true and correct copy of that report is attached as Exhibit 4.

6.      I also more broadly searched the Internet to see if I could get more information concerning Dorothy L. Sayers.  In connection with that search, I discovered that there is an organization that calls itself "The Dorothy L. Sayers Society" in the United Kingdom, which maintains a website at https://www.sayers.org.uk/.  In reviewing that website, I learned that The Dorothy l. Sayers Society was offering for sale various books by and about Ms. Sayers, including a series of books entitled *The Letters of Dorothy L. Sayers.*  Those books consist of a selection of letters Ms. Sayers wrote throughout her life.  I purchased two volumes of those books, which cover letters Ms. Sayers wrote from 1944 to 1957.   In one of those volumes, I discovered a series of letters Ms. Sayers wrote to C.W. Scott-Giles before

3

1  the *Divine Comedy* was published that discussed the *Divine Comedy* and whether Mr.

2  Scott-Giles would be willing to help her with illustrations for it.  Attached as Exhibit 1

3  is a true and correct copy of the cover, inner sleeve, and several letters and drawings

4  Ms. Sayers sent to Mr. Scott-Giles on those subjects as reproduced in that book.

5       7.     With the information contained in *The Letters of Dorothy L. Sayers*, I also

6  investigated to see if I could determine who might presently own relevant copyright

7  interests, and where people or organizations are located who might have information

8  about copyright ownership of the Illustration which Plaintiff's Complaint claims my

9  clients infringed.

10       8.     I first determined that the Dorothy L. Sayers Society, which might have

11  the original letters or copies of the original letters, as well as other documents from

12  Ms. Sayers' estate, is located in the United Kingdom, as it states on its website.  See

13  https://www.sayers.org.uk/.

14       9.     *The Letters of Dorothy L. Sayers* was edited by Barbara Reynolds, who

15  online research indicated had also completed the English language translation of the

16  third volume of the *Divine Comedy* after Dorothy L. Sayers' 1957 death, and been Ms.

17  Sayers' goddaughter, student, friend, biographer, and the first head of *The Dorothy L.*

18  *Sayers Society*. She was reported to have passed away in England in 2015.  See

19  https://www.sayers.org.uk/news-page/2015/4/29/rip-dr-barbara-

20  reynolds?rq=Barbara%20Reynolds; https://www.sayers.org.uk/news-

21  page/2015/4/29/rip-dr-barbara-reynolds.

22       10.     Ms. Sayers' son and sole heir, identified as Anthony Fleming or John

23  Anthony Fleming, was reported to have passed away in 1984, and I could find no

24  indication that he had any children.  See https://www.wikitree.com/wiki/Sayers-795.  I

25  also found no information concerning who presently owns Ms. Sayers' or Mr.

26  Fleming's copyright interests in Ms. Sayers' works.

27       11.     The *Divine Comedy* publisher Penguin Books Ltd, which also might have

28  documentation concerning the *Divine Comedy*, reportedly has its offices in England.

4

1    See https://www.penguin.co.uk/company/contact-us---offices.html.

2        12.    Exhibit 5 to the Complaint is a letter opposing counsel sent to my client,

3    and is the letter I responded to in Exhibit 6 to the Complaint. Exhibit 5 mentions a

4    draft complaint, and one was attached with the letter to which I responded, but it was

5    not included with Exhibit 5 itself.  Attached as Exhibit 5 is a true and correct copy of

6    the draft complaint that was included with the letter that is attached as Exhibit 5 to the

7    Complaint.

8        13.    In my online research concerning the *Divine Comedy*, I discovered

9    references to several editions of it in another online database found at

10   https://www.worldcat.org/.  That website describes itself as "The World's Largest

11   Library Catalog," and the "World's most comprehensive database of information about

12   library collections," see above and at https://www.oclc.org/en/worldcat.html. It

13   consists largely of a cooperative of thousands of university and other libraries' online

14   collections.

15       14.    When I searched that database, I found references to several editions of

16   the *Divine Comedy*, the oldest of which described the "Publisher" as "Baltimore;

17   Penguin Books, (1949)," along with a number of Los Angeles area libraries where it

18   could be found. A true and correct copy of a printout of the first pages of those search

19   results is attached as Exhibit 2.

20       15.    I have some experience in conducting international discovery in U.S.

21   litigation , and have learned that obtaining evidence abroad for use in U.S. litigation

22   through international conventions is more complicated, time-consuming, expensive,

23   and uncertain than taking depositions or obtaining documents by document request or

24   subpoena in U.S. litigation from people or companies in the U.S..

25       16.    In preparing this motion, I discovered Judicial Caseload Statistics posted

26   on the "U.S. Courts" website at https://www.uscourts.gov/statistics-reports/federal-

27   court-management-statistics-m. Attached as Exhibit 6 is a true and correct copy of an

28   excerpt from the March 2021 Report which describes such statistics for the Central

DECLARATIONS OF MARK S. LEE, MICHAEL SKREIN, ALEX KLETT, JOHN SILVA AND JOEL M. BENNETT
IN SUPPORT OF NIRVANA'S MOTION TO DISMISS

District of California from March 2016 through March 2021 is attached as Exhibit 6.

17.    In preparing this motion I also found a briefing paper in the U.K.'s online House of Commons Library which included Court statistics for England and Wales from about 2009 through 2020.  A true and correct copy of an excerpt from that report is attached as Exhibit 7.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 9th day of August, 2021, at Los Angeles, California.

/s/ Mark S. Lee
Mark S. Lee

DECLARATIONS OF MARK S. LEE, MICHAEL SKREIN, ALEX KLETT, JOHN SILVA AND JOEL M. BENNETT
IN SUPPORT OF NIRVANA'S MOTION TO DISMISS

## <u>DECLARATION OF STEPHEN PETER MICHAEL SKREIN</u>

1.      I hold the degree of Master of Arts from the universities of Oxford and of Southern California and am a solicitor of the Senior Courts of England and Wales, admitted in 1973.  I became a litigation partner in the firm of Richards, Butler & Co. in 1976.  I am now a partner in the firm of Reed Smith LLP, into which Richards Butler was subsumed.  An area of legal work in which I have worked extensively for decades is copyright. My career details appear online at: https://www.reedsmith.com/en/professionals/s/skrein-michael.

2.      I have read the Complaint in this matter dated 28 April 2021 and Exhibits 1-16 thereto.  I make this declaration in order to assist the Court on certain matters of the copyright law of England and Wales.  For simplicity, I shall refer to "England" and to "English law", as there is a unified legal system in England and Wales.

3.      The Plaintiff states [Complaint, ¶9] that she is a UK citizen, [¶14] that she is the successor-in-title to the copyright in certain works created by Mr. Scott-Giles and that he was a UK citizen (and impliedly in or around 1949 he was a British subject) who died in February 1982.  The claim to be successor-in-title to the owner of the copyright is unlikely to be an easy matter to decide in law, and it needs more explanation from the Plaintiff of facts that go to whether Mr. Scott-Giles was the, or an, owner and then facts as to her successorship.

### THE 1911 ACT

4.      The key current copyright provision in the United Kingdom of Great Britain and Northern Ireland is the Copyright, Designs and Patents Act 1988 ("CDPA").  Its text is at www.legislation.gov.uk/ukpga/1988/48/contents.

5.      The leading textbook on UK copyright law is *Copinger and Skone James on Copyright*, now in its 18th edition.  As it explains at 5-03,

"The rules relating to first ownership of copyright have altered from time to time. As with authorship, the provisions of the 1988 Act have been

7

framed so as to avoid any retrospective alteration in the identity of the first owner of the copyright. This is achieved by a transitional provision to the effect that the law which was in force when the work was made must be applied to determine who was the first owner of the copyright. The effect is shown by the following table:

| Date when work made | Act to be applied |
|---|---|
| On or after 1 August 1989 | The 1988 Act |
| On or after 1 June 1957 but before 1 August 1989 | The 1956 Act |
| On or after 1 July 1912, but before 1 June 1957 | The 1911 Act". |

6.      Schedule 1, paragraph 10 of the CDPA provides that: "The question who was the author of an existing work shall be determined in accordance with the new copyright provisions for the purposes of the rights conferred by Chapter IV of Part I (moral rights), and for all other purposes shall be determined in accordance with the law in force at the time the work was made".

7.      The Plaintiff claims [Complaint, ¶1] to be the legal owner of the copyright in the "Illustration" which [Complaint, ¶16] she asserts that Mr. Scott-Giles drew in or about 1949.  She states [Complaint, ¶17] that the Sayers translation containing the Illustration was first published in the UK on 16 November 1949.  The law that governed the authorship and ownership of the Illustration was, as stated above, the Copyright Act, 1911, the text of which is at www.legislation.gov.uk/ukpga/Geo5/1-2/46/introduction/enacted. The Illustration is an artistic work.  Under section 35(1) of the 1911 Act, "Artistic work" includes works of drawing, artistic craftsmanship and engravings.

8.      Section 5 of the 1911 Act provides that "the author of a work shall be the first owner of the copyright therein".  This is subject to two important provisions: "where, in the case of an engraving … the plate or other original was ordered by
    some other person and was made for valuable consideration in pursuance
    of that order, then, in the absence of any agreement to the contrary, the

8

person by whom such plate or other original was ordered shall be the first owner of the copyright".

"where the author was in the employment of some other person under a contract of service … and the work was made in the course of his employment by that person, the person by whom the author was employed shall, in the absence of any agreement to the contrary, be the first owner of the copyright".

9.      The first of these provisos prompts the question as to whether the Illustration that Mr. Scott-Giles is said to have drawn was indeed an engraving.  The *Oxford English Dictionary* defines an engraving as "an impression from an engraved plate".  If this matter were tried in England the court would want to know the process of creation of the Illustration.  Was it, for instance, a representation "by lines incised upon metal plates (in mod. use, also by lines carved in relief of wood blocks) with the view of reproducing it by printing" (*Oxford English Dictionary*)?  It is clear from *Copinger* at 3-140 that there is no certainty in law on whether something will qualify as an engraving or not.

10.     The Plaintiff claims [Complaint, ¶16] that Mr. Scott-Giles drew the Illustration to accompany an English translation of a volume "by his close friend Dorothy L. Sayers".  The Complaint does not disclose the circumstances, for instance whether Mr. Scott-Giles was in anyone's employment and whether the work was made in the course of that employment, nor whether it was ordered by Ms. Sayers and was made for valuable consideration.  If this matter were to be tried in the courts of England these circumstances would be the subject of rigorous inquiry.  The Civil Procedure Rules ("CPR") impose onerous duties on litigants to disclose what documents exist or may exist that are or may be relevant to the matters in issue in the case [https://www.justice.gov.uk/courts/procedure-rules/civil/rules/part31].  Disclosure (it used to be described in England as "discovery") is generally required of any relevant documents that it is reasonable to suppose may contain information that enables the disclosing party to advance its own case or to damage that of any

9

other party, or that leads to an inquiry which has either of those consequences. Standard disclosure requires [CPR 31.6] a party to disclose (a) the documents on which that party relies; and (b) the documents which (i) adversely affect that party's own case; (ii) adversely affect another party's case; or (iii) support another party's case; and (c) the documents which the relevant practice direction requires to be disclosed.  In this case, the disclosure process is likely to be particularly important, and unpredictable in result, as key witnesses of fact are no longer alive.

11.     *Copinger* states [5-08] that "it has for many years been the position under UK law …  that copyright in the work made by an employee will, prima facie, vest in the employer".  *Copinger* explains [5-12]  that "A contract of service will exist if three conditions are satisfied: (i) the servant agrees, in consideration of a wage or other remuneration, to provide their own work and skill in the performance of some work for another; (ii) it is agreed, expressly or impliedly, that in the performance of that work the servant will be subject to the other's control in a sufficient degree to make that other their master; and (iii) the other provisions of the contract are consistent with its being a contract of service. There is an "irreducible minimum of mutual obligations necessary to create a contract of service", in the sense of an obligation to provide work and a corresponding obligation to undertake it".  Determining how the facts of each situation match this legal framework tends to be difficult.  However, English judges are used to deciding such issues, first with a finding of the facts, aided by the disclosure rules of the CPR and in this case perhaps requiring the compulsion of third parties in the jurisdiction to give oral evidence and/or disclose documents, and then judging how the facts fit into the structure imposed by law.

12.     A reading of this section of *Copinger* reveals how difficult an assessment this can be.  *Copinger's* discussion of the determination of whether there is a contract of service states that:

"Evaluation of the position is not a mechanical exercise of checking off the various factors but of evaluating the whole picture painted from the accumulation of detail. The terms of the contract as a whole need to be looked at, giving attention particularly to the substantive obligations and rights of each party, so as to determine whether they are more strongly indicative of one form of relationship rather than the other. The test of whether the person is in business on their own account may not be so helpful in the case of a person carrying on a profession or vocation, when it may be more important to bear in mind the traditional contrast between a servant and an independent contractor, the extent to which the person is dependent upon or independent of a particular paymaster for the financial exploitation of their talents being of significance. Whether a person is engaged under a contract of service or not is a question of law depending upon the facts: the question is always what was the true legal relationship between the parties".

13. Under the heading "**Test is of substance not form of the relationship**", *Copinger* gives numerous examples that "show that each case turns on its own facts".

14. As for "valuable consideration", it is clear that this requires a similarly fact intensive inquiry. The learned authors state at 5-36 that:

"Valuable consideration usually consists of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other. It clearly includes money or money's worth, but excludes a consideration which is illusory or merely nominal. Some of the cases on this point are not easy to reconcile.

(a) Where a claimant was in the business of taking and selling photographs of well-known sporting celebrities and requested and was allowed to take a photograph of one such person, on terms that the photographer be allowed to print and sell copies, the celebrity was held thereby to have given good

1    and valuable consideration.

2    (b) Where a celebrity agreed to a request by a photographer to sit for her

3    photograph, without any charge being made by the photographer, this did

4    not amount to good or valuable consideration.

5    (c) Where a firm of photographers took photographs of school premises

6    and pupils with the permission of the proprietors, it being clearly

7    understood that no one was compelled to buy any prints, the photographers

8    reasonably speculating that they would in fact make sales to pupils and

9    others, it was held that the proprietors had given "good", although

10   apparently not "valuable", consideration by permitting the photographers

11   to have access to private premises and showing them around".

12   15.      The fact intensive and difficult enquiry will include investigation into,

13   for instance, the express or implied consideration that attached to any agreement

14   between Ms. Sayers and Mr. Scott-Giles that the latter would provide the drawing

15   and indeed whether there was any agreement as to who would own it.  There may be

16   documents that disclose or cast a light on these matters, and their disclosure may

17   have to be compelled.  I discuss this below in the section about evidence.

18                              **JOINT AUTHORSHIP**

19   16.      There is a presumption [1911 Act, s.6(3)] that, if a name purporting to

20   be that of the author of the work is printed or otherwise indicated thereon in the usual

21   manner, that person, shall, unless the contrary is proved, be presumed to be the

22   author.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

17.     *Copinger* [at 4-48] summarises joint authorship as follows:

"For a work to be a work of joint authorship, each of the collaborators must be an "author". … In summary, the statutory test derived from ss. 9(1) and 10(3) of the 1988 Act involves asking simply who created the work in question. It encompasses those who contribute skill and effort in recording the work (e.g. by writing) but also the skill and effort involved in creating, selecting or gathering the detailed concepts, data or emotions which are so recorded. It is wrong to focus too much on who actually, for example, "pushed the pen" or who had the ultimate responsibility for the work. The element of authorship is closely linked to the next element in the definition of joint authorship—that of the contribution which is considered below".

18.     The definition of "a work of joint authorship" is [1911 Act, s.16(3)] "a work produced by the collaboration of two or more authors in which the contribution of one author is not distinct from the contribution of the other author or authors".  So, what is meant by "not distinct"?  *Copinger* discusses this at 4-50 as follows.

"… the fact that a person's contribution can be identified in the final work does not mean it is distinct. Rather, the issue is whether it forms an integral part of the work, without which the work would be different in character. If the contributions of each author are distinct, then what is produced will not be a work of joint authorship but works of separate authorship, even if they were acting pursuant to a common design. Each person will be the author of the part which they have contributed, each being a separate work. An example would be an encyclopaedia, where there will usually be a large number of copyright works consisting of the individual entries, each having its separate author. In the case of such works it will be unusual if there is not also a further copyright work, being the encyclopaedia considered as a whole, with its own author or authors who have brought the works together".

13

19.     Determination of whether a work is one of joint authorship under our copyright law is a particularly complex and nuanced exercise.[1]  These difficult and detailed cases are decided on the basis of proof given by the best evidence available. Ideally, that is the evidence of the key personages.  But both Ms. Sayers and Mr. Scott-Giles are no longer alive.  Publication was 70 years ago.  That makes the determination of the joint authorship question particularly challenging.  It is possible that there are people alive who have useful evidence that can be given – orally in a court or by disclosure of documents.  If they are in England the court has power to compel their assistance.  An English court is more likely to be able to make meaningful progress in such an inquiry[2] than a court outside England.

20.     *Copinger* at 4-49 shows how complex an analysis is required.  Thus, "For a person to be a joint author of a work, that person must have contributed to the creation of the work and that contribution must be "an authorial one. In other words, the collaborator must have contributed to the literary, dramatic, musical or artistic form in which copyright subsists, i.e. must have contributed the right kind of skill and labour (intellectual creativity) and in sufficient amount. It may be helpful to break the concept

---

[1] A recent example is the dispute over the screenplay for "Florence Foster Jenkins".  It had to go to a re-trial in the Intellectual Property Enterprise Court, which determined that the screenplay was a work of joint authorship.  The Court of Appeal set aside the judgment of an experienced judge and ordered a new trial, holding that "a reconsideration of all the evidence would show that Ms Kogan's contribution was indeed made as part of a collaboration and passed the quantitative threshold for joint authorship."  The Court of Appeal judgment (https://www.bailii.org/ew/cases/EWCA/Civ/2019/1645.html) shows how difficult it can be to decide joint authorship cases.

[2] The need for an inquiry is stark.  Paragraph 16 of the Complaint claims that "Mr. Scott-Giles drew the Illustration in or about 1949 to accompany an English translation of the first volume of the Dante Trilogy ("*Hell*") by his close friend Dorothy L. Sayers".  The Complaint is otherwise silent on the circumstances giving rise to Mr. Scott-Giles' said work.  The court faces a difficult task.

14

of a contribution into four requirements: (1) the collaborator must make a contribution of some sort; (2) it must have been significant; (3) it must have been original; and (4) it must have been a contribution to the creation of the work. The last requirement may often be crucial, in the sense that a contribution which does not find itself expressed in the final work will not be relevant. In general as to this requirement, the skill and labour need not be contributed in an amount equal to that of the other co-author or co-authors, and need not be of the same kind, so that, for example, someone whose principal role is to arrange the songs written by their collaborators can be a joint author. It will be a matter of fact and degree whether their contribution was large enough to make them a joint author. It follows that a person who is merely the medium for transmitting to paper, canvas, etc. the original work of another, is not an author and the work is not a work of joint authorship. Looking at the other side of the coin, a person who merely suggests the idea, without contributing anything to the literary, dramatic or other form in which copyright subsists, is also not a joint author. A situation can clearly arise, however, where two people each make a contribution to the work's final expression, one being the person actually responsible for committing the work to paper, the other providing an input into what is recorded. Significantly, the fact that one person has the final say does not prevent a work being a work of joint authorship".

This is manifestly very intricate.  It may be found at trial that Mr. Scott-Giles worked from illustrations that were the work of Ms. Sayers or at least that the Illustration was jointly authored (see *Copinger* at 4-36 on "providing preliminary sketches, stipulating the form of the final design and shepherding the design as it evolved").

21.     Whether a work is one of joint authorship is, of course, relevant to *locus*

DECLARATIONS OF MARK S. LEE, MICHAEL SKREIN, ALEX KLETT, JOHN SILVA AND JOEL M. BENNETT IN SUPPORT OF NIRVANA'S MOTION TO DISMISS

1  *standi* but also to relief[3].  Per *Copinger* [5-203], "One co-owner can … sue third

2  parties for infringement and obtain an injunction and damages without joining the

3  other co-owners. Probably, one tenant in common can only recover damages for the

4  injury done to that tenant in common's share".[4]  The use of the word "probably"

5  indicates that the law is not settled.  There was, however, some discussion in an

6  Australian case, based on an older edition of *Copinger*.[5]

7  <center>**EQUITABLE TITLE ARISING ON CREATION OF A WORK**</center>

8      22.    *Copinger* explains at 5-206 that "the circumstances in which [a] work is

9  made [may] mean that the beneficial owner is in fact some person other than the legal

10  owner. This may be because this is what the parties agreed or it may be the

11  consequence of some fiduciary or trust relationship".  Something that will doubtless

12  need to be decided is whether there was such an agreement, or indeed any agreement,

13  about ownership and, if there was not, what the law says about ownership.  *Copinger*

14  5-207 states that "There is no limit to the variety of contractual situations in which

15  parties may agree that the copyright in a work yet to be created will belong to

16  someone other than the first legal owner", and then that:

17      ///

18      ///

19

---

20  [3] If this was a work of joint authorship, is the point moot as Ms. Sayers is no longer

21  alive?  *Copinger* deals with transmission of ownership [at 5-200].  It explains that
"The interest of one joint owner in the copyright may be assigned. On the death of one

22  joint tenant, that person's interest in the copyright will pass to the other joint owners
by survivorship. On the death of one tenant in common, that person's interest passes to

23  their personal representatives as part of their estate".  There is no suggestion that Ms.
Sayers' share has passed to the Plaintiff.  But this is yet another aspect of English law

24  that may fall to be considered.

25  [4] Interestingly, footnote (h) on page 203 of the 1948 edition of *Copinger* asks:

26  "*Quaere*, whether he could not recover the full amount of damages, subject to a
liability to account to his co-authors". As the estate of Ms Sayers is not before the

27  court, this issue may be more suitable for determination in an English court as it might
depend on the facts of the stewardship of Ms. Sayers' estate.

28  [5] Prior v Lansdowne Press Pty Ltd [1977] RPC 511.

<center>16</center>

1  "Often the contract is silent or ineffectual to transfer the future legal title,
2  but if the intention of the parties (whether express or implied) is that a party
3  other than the first legal owner should be entitled to the copyright, then that
4  party will acquire an equitable title in the copyright when the work is made,
5  provided that that party entitled to enforce its claim in equity to have the
6  title vested in it by the legal owner. This will often be the case where the
7  author was paid to create the work. The consequence of such an
8  arrangement will be that the copyright is held on trust by the legal owner,
9  and the legal owner must transfer the legal title if called upon to do so".

10  23.      The point is developed in this way at 5-208:

11  "It has already been seen that, except in certain pre-1988 Act cases, a
12  person who commissions a work to be made by another does not thereby
13  become the first legal owner of the copyright. The question arises, however,
14  whether the commissioner might have an equitable interest in the copyright
15  or merely a lesser right such as some form of licence."

16      The answer to this question depends on the terms of the commissioning
17  agreement. Where those terms expressly deal with the copyright, little difficulty
18  usually arises. Where, on the other hand, the matter is not dealt with expressly, and the
19  issue is one of implied terms, it can be very hard to determine what the true position is.
20  If the circumstances show that the commissioner was intended to be the owner of the
21  copyright, then equitable title can arise. However, the mere fact that a work has been
22  commissioned is not sufficient for these purposes as that fact can be equally consistent
23  with an intention that the commissioner should merely have a licence to use the
24  commissioned work. Indeed, it has been said that:

25      ///
26      ///
27      ///
28      ///

DECLARATIONS OF MARK S. LEE, MICHAEL SKREIN, ALEX KLETT, JOHN SILVA AND JOEL M. BENNETT IN SUPPORT OF NIRVANA'S MOTION TO DISMISS

"the engagement for reward of a person to produce material of a nature which is capable of being the subject of copyright implies a permission, or consent, or licence in the person giving the engagement to use the material in the manner and for the purpose in which and for which it was contemplated between the parties that it would be used at the time of the engagement".

Hence, the result of the transaction may simply be that the commissioner becomes entitled to the property in the physical material created and to a license to use it for the particular purpose envisaged by the parties, but does not become equitable owner of the copyright. On the other hand, there are cases where the circumstances are such that a term can be implied that the commissioner was to be the owner of the copyright and is therefore the equitable owner".

24.    It will be apparent that this is a highly complex and precarious topic. *Copinger* discusses it further at 5-209.  One needs to consider when a term is to be implied into a contract, including the "necessity" test which, as *Copinger* explains, "is not an absolute one; it requires a value judgment" and needs to be judged by reference to "business efficacy", another feature of this aspect of English law.

25.    5-211 examines the scope of the implied term and the development of English law.  It observes that "the dicta from some earlier cases can be dangerous". This is volatile legal territory.  The law has been moving towards implying the grant of a licence rather than an assignment.  However, *Copinger* concludes that

"there are still situations where it would be proper to imply a term for the assignment of copyright in a commissioned work because, for example, the agreement in question would not satisfy the requirements for the grant of a statutory exclusive licence and so, to imply a term for such a grant would not give business efficacy to the contract. In any event, the remedies of an exclusive licensee are not necessarily as good as those of a copyright

18

owner. If, therefore, it would have been obvious that the commissioner might need to enforce the copyright against third parties and have exclusive control over the work, this will point to an implied term for an assignment".

26.     The matter is then considered at 5-212 *et seq.*.  I point to examples here that may be particularly apposite.  One is where "neither party can have contemplated that the author of the work would have any other genuine use for it, [which] may justify the implication of an agreement to assign the copyright to the commissioner". Another, which seems very pertinent, is that: "The impact of an assignment on the author and whether it could sensibly have been intended that the author should retain the copyright obviously needs to be considered. The fact that the author may have made use of underlying works supplied and owned by the commissioner, such as preliminary drafts or sketches, so that the commissioned work could not be used by the author without infringing the copyright in these underlying works, will also support such an implication".  Similarly, "where a commissioner provides the author with material in which the commissioner owned copyright with a view to such material being incorporated in the commissioned work, that may be a pointer towards the implication of a term that the commissioner was also intended to own the copyright in the commissioned work".

27.     What if there is no contract of service?  Per 5-213, "The legal title to most works made by an author in the course of their employment under a contract of service will belong to the employer. Even where this is not the case, the work may nevertheless have been made in circumstances that a term is to be implied that the copyright should belong to whoever has engaged or employed the author".

///

///

///

///

19

## SEPARATION

28.     A further complication relates to the possibility of equitable ownership.  *Copinger* explains that:  "It happens frequently that the legal and beneficial titles to a copyright work become separated" [5-204].  "There are no set rules which determine the circumstances in which an equitable title arises.  By definition, it occurs on an event which results in the legal and beneficial titles becoming separated … . Writing is not necessary to create an equitable interest" [5-205]. "In many cases … the circumstances in which the work is made mean that the beneficial owner is in fact some person other than the legal owner" [5-206].  "There is no limit to the variety of contractual situations in which parties may agree that the copyright in a work yet to be created will belong to someone other than the first legal owner … .  Often the contract is silent or ineffectual to transfer the future legal title, but if the intention of the parties (whether express or implied) is that a party other than the first legal owner should be entitled to the copyright, then that party will acquire an equitable title in the copyright when the work is made, provided that that party [is] entitled to enforce its claim in equity to have the title vested in it by the legal owner.  This will often be the case where the author was paid to create the work.  The consequence of such an arrangement will be that the copyright is held on trust by the legal owner, and the legal owner must transfer the legal title if called upon to do so." [5-207].

29.     The terms on which Mr. Scott-Giles and Ms. Sayers collaborated appear far from clear.  I am not aware that there was a written contract; nor of the full extent of any remaining evidence of the intention of the parties as to who should be entitled to the copyright.  The indications are that Mr. Scott-Giles was paid for his contribution.

30.     "An oral agreement supported by sufficient consideration can clearly be effective to create an equitable title, whether or not the consideration has been executed" [5-207].  *Copinger* deals [at 5-208] with commissioned works.  We must

20

1  remember that section 5(1)(a) of the 1911 Act renders the commissioner for valuable

2  consideration of an engraving the first owner of the copyright.  Even where that does

3  not happen, "The question arises, however, whether the commissioner might have an

4  equitable interest in the copyright or merely a lesser right such as some form of

5  licence".  *Copinger* tells us that the answer depends on the terms of the

6  commissioning agreement and, not surprisingly, where those terms expressly deal

7  with the copyright, little difficulty usually arises.  Where on the other hand the matter

8  is not dealt with expressly, and the issue is one of implied terms "it can be very hard

9  to determine what the true position is.  If the circumstances show that the

10  commissioner was intended to be the owner of the copyright, then equitable title can

11  arise.  However, the mere fact that a work has been commissioned is not sufficient

12  for these purposes as that fact can be equally consistent with an intention that the

13  commissioner should merely have a licence to use the commissioned work".  The

14  discussion in *Copinger* continues at some length.  It suffices to say for present

15  purposes, especially as this was a pre-1988 Act situation and therefore an exception

16  to the post-1988 Act position that a person who commissions a work to be made by

17  another does not thereby become the first legal owner of the copyright, it is possible

18  that in this case the work of Mr. Scott-Giles will be found to have been

19  commissioned[6], with the consequence that the commissioner will have become the

20  first legal owner.

21  ///

22  ///

23  ///

24  ///

25

---

26  [6] It is worth noting that there is something of a dearth of reported cases on commissioning.  Those that there are (see for instance *James Arnold v Miafern Limited* [1980] RPC 397 and *Milligan v The Broadway Cinema Productions Limited* [1923] SLT 35) do not involve similar or readily analogous factual settings.  The tribunal deciding this case will therefore need to relate facts to a somewhat elusive body of case law.

21

31.      In *BP Refinery (Westernport) Pty Ltd v President, Councillors and Ratepayers of the Shire of Hastings* (1977) 52 ALJR 20 Lord Simon in the United Kingdom Privy Council (a tribunal of the same status as was the House of Lords and is now the Supreme Court, in other words, the highest level of authority) summarised the general principles governing the implication of terms in an agreement as follows:

> "for a term to be implied, the following conditions (which may overlap) must be satisfied: (1) it must be reasonable and equitable; (2) it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it; (3) it must be so obvious that 'it goes without saying'; (4) it must be capable of clear expression; (5) it must not contradict any express term of the contract".

32.      And, as the Supreme Court held in *Marks and Spencer Plc v BNP Paribas Securities Services Trust Co (Jersey) Ltd* [2015] UKSC 72 at [21] and [67(ii)], implication of a term is not critically dependent on the parties' *actual* intention. It is not the hypothetical answer of the actual parties with which the court is concerned but rather that of the notional reasonable person in the position of the parties at the time they were contracting. Determining this in the present case, an English court would clearly look at the factual matrix, as it appears at trial (in other words after disclosure) and whatever other evidence is available for this inquiry and in doing so would have in mind the decision of the Privy Council in *Attorney General of Belize –v- Telecom Ltd* (2009) UKPC 10 at [22]-[27] to the effect that a contract may work perfectly well in the sense that both parties can perform their express obligations so that no implied term is "necessary to give business efficacy" to it, but the consequences would contradict what a reasonable person would understand the contract to mean. In such a case, a term should therefore be implied. Thus there is in England complex and sometimes confusing law surrounding the necessity test.

33.      *Copinger* concludes, applying the principles to commissioned works,

> "it is almost inevitable that, in the absence of a detailed contract, some term

would have to be implied.  The question is generally whether that term should be for: (a) a non-exclusive licence; (b) an exclusive licence; or (c) an assignment of the copyright (in whole or in part)" [5-210].

34.     The law has been developing.  In *Sweet v Benning* (1855) 139 E.R. 838 Maude J stated that:

> "Where a man employs another to write an article, or to do anything else for him, unless there is something in the surrounding circumstances, or in the course of dealing between the parties, to require a different construction … it is to be understood that the writing or other thing is produced upon the terms that the copyright therein shall belong to the employer".

35.     The law has evolved since the 1956 Act but the situation we are looking at here concerns the creation of a work before 1956.  As *Copinger* states at footnote 717, cases decided before the 1956 Act are generally likely to be of little guidance as before then an exclusive licensee had no right to sue for infringement of copyright. Though at 5-211 it warns that the dicta from some earlier cases "can be dangerous in that they suggest a greater willingness to imply a term for an assignment of copyright to a commissioner", *Copinger* concludes that:

> "Nevertheless, there are still situations where it would be proper to imply a term for the assignment of copyright in a commissioned work because, for example, the agreement in question would not satisfy the requirements for the grant of a statutory exclusive licence and so, to imply a term for such a grant would not give business efficacy to the contract".

36.     "In any event, the remedies of an exclusive licensee are not necessarily as good as those of a copyright owner.   If, therefore, it would have been obvious that the commissioner might need to enforce the copyright against third parties and have exclusive control over the work, this will point to an implied term for an assignment" [5-211].  One can readily see that a court might hold this to be the situation in this case.

23

37.     *Copinger* discusses [at 5-212] other factors in determining the scope of the implied term and gives a telling example:

> "(3) The impact of an assignment on the author and whether it could sensibly have been intended that the author should retain the copyright obviously needs to be considered.  The fact that the author may have made use of underlying works supplied and owned by the commissioner, such as preliminary drafts or sketches, so that the commissioned work could not be used by the author without infringing the copyright in these underlying works, will also support such an implication".

## INFRINGEMENT

38.     How the analysis in this case measures against this test falls to be determined by reference to the English law relating to copyright infringement.  That law is, as might be expected, not simple, and judicial conclusions on infringement in any particular case are notoriously difficult.

39.     It is, of course, a matter of judgement as to whether in any given case acts are, or would be, infringing.  As one might expect, there is case law, but cases are so fact-specific that judicial decisions may appear contradictory.   It is very often impossible to predict before trial whether a judge will or will not decide that there has been infringement.

## ACQUIESCENCE AND LACHES

40.     ¶21 of the Complaint asserts that unauthorised uses of Nirvana-branded merchandise date back to 1989.  ¶¶18 and 19 of the Complaint suggest that it was only in 2021 that the Plaintiff discovered any of what are claimed to be infringing activities of the Defendants.  There must be a question as to whether there has been acquiescence on the part of the Plaintiff over the intervening 32 years.  An important factor in deciding this will be the state and timing of the Plaintiff's knowledge.  In

24

England it will be for the trial court to determine that.

41.     As *Copinger* explains at 5-262, "Where a copyright owner stands back and allows another to assume that no objection will be taken to the exploitation of the work, the effect may be that the copyright owner will become estopped from asserting that there was no consent or that any consent has been revoked. The ordinary principles of estoppel or acquiescence will operate".

42.     *Phipson on Evidence*, 19th Ed. is the leading text book on evidence.  It states at 5-18 that an *estoppel in pais* may arise from agreement, by convention, by representation, from silence, omission or acquiescence, and from negligence.   At 5-43 it explains that where no provisions of the Limitation Act 1980 apply what will be determinative is the doctrine of *laches*. It is then for the person against whom the claim is being made to show that the person making that claim has known of her rights for a substantial period of time and has acquiesced in conduct inconsistent with them. There are no fixed rules as to the period of time that must elapse; it must in the particular case be sufficiently long to enable the court to impute acquiescence. The essence of the defence of *laches* is therefore acquiescence on the part of the person making the claim when she has full knowledge of the facts.

43.     In the context of commercial contracts the law has developed so that there is a recognition of "a duty to speak", failure to fulfil which would give rise to estoppel by acquiescence.  This case may not involve such a contract.  Even so, it may still be that the facts suggest a duty upon the Plaintiff to speak, so that it would be unjust for her now to claim if she had any knowledge whatsoever of the acts that she says infringe her rights.  This being a matter of equity, if this were to be an issue in the case it would very obviously be appropriate for an English court to apply the principles of equity that are followed in English courts, and they may differ significantly from the way in which those principles and their application have evolved in, for instance, California.

     ///

44.      As well as the above, I would expect it to be important for the trial court to consider and, in relation to alleged infringement in England, apply English law in relation to matters of which, though the Plaintiff was in fact (if that is found to be the case) unaware, she ought to have been aware.  The volume of the activities in or towards England of some or all of the Defendants may prompt this enquiry.  The authoritative *Laddie, Prescott & Vitoria: The Modern Law of Copyright*, 5th edn. (2018) states at ¶26.13:

> "Since injunctions are part of the equitable jurisdiction of the court, the right to such relief may be barred by acquiescence, laches or estoppel. We cannot in this text do justice to the distinctions between laches, acquiescence and estoppel, and the circumstances in which such distinctions are important; for that, readers are advised to consult a specialist text on equitable bars to remedies. However, in most cases such distinctions can be ignored, because recently a broad approach has been adopted 'directed to ascertaining whether, in particular individual circumstances, it would be unconscionable for a party to be permitted to deny that which, knowingly or unknowingly, he has allowed or encouraged another to assume to his detriment'. On this approach the court must perform an assessment in which various elements may be taken into account. It is submitted that these may include:
>
> (1)    the extent to which the defendant has been prejudiced by the claimant's conduct or inaction;
>
> (2)    whether the claimant knew or ought to have known of the defendant's activities;
>
> (3)    whether the defendant acted in ignorance of the claimant's rights or under a reasonable belief that they would not be enforced;

(4)    whether the claimant did something to induce in the defendant's mind a reasonable belief that those rights did not exist or would not be enforced;

(5)    whether the claimant knew or ought to have known that the defendant, when modifying his position to his prejudice (eg building up a business), was labouring under a misapprehension;

(6)    the length of any delay;

(7)    the nature of the right or remedy sought to be asserted (more will be required where it is said that the claimant's conduct has been such as to cause him to lose his legal right altogether).

Merely standing by and delaying commencing proceedings, without doing anything to encourage the defendant's actions, to create an expectation as to the future, or to lull the defendant into a false sense of security, does not create a bar to relief (save for any bar created by the provisions of the Limitation Act 1980). However, delay may be evidence which, taken together with other evidence, may lead the court to a finding of acquiescence; and the greater the delay, the more readily it may be inferred".

45.    Of course, "whether the claimant knew or ought to have known of the defendant's activities" breaks down into two questions.  First, whether the claimant "knew" is a question of fact, to be tested at trial on all the evidence.  That of whether she "ought to have known" is one of mixed fact and law.  The law on "ought to have known" is complex and indeed obscure.  It would probably have to be resolved by resort to principle and to analogous case law in other areas of law – so, yet more areas of English law for a non-English court to grapple with.

## QUANTUM

**46.**    I respectfully suggest that the determination of the monetary relief due to

27

1  the Plaintiff in respect of U.K. infringement, if liability is established, is likely to be
2  easier for an English court than for one outside England.  If the Plaintiff elects to
3  pursue damages, evidence will be required as to customary royalties and practices,
4  with evidence from witnesses qualified to assist with the benefit of their trade
5  knowledge - evidence that may be tested in cross-examination.  Deciding what
6  damages would be due to the Plaintiff here, as opposed to the damages that would
7  have been due to her fellow tenant in common, would most naturally be the work of
8  an English judge familiar with English intellectual property law.

9
10                                    **EVIDENCE**

11      47.      The English courts have power to compel someone who is not a party to
12  a case to disclose documents and to give evidence.  *Matthews and Malek, Disclosure*,
13  5th edn. (2016), deals in Chapter 10 with production by non-parties in the following
14  way.

15          "10.02 A most important means of obtaining documents from non-
16          parties during the currency of litigation is the witness summons, …
17          formerly known in the High Court in relation to documents as the subpoena
18          duces tecum.

19          There are two forms of witness summons, although the relevant
20          practice form combines both elements. First there is the summons to attend
21          court to provide oral evidence on behalf of the party issuing the summons
22          (in the High Court formerly known as a subpoena ad testificandum).
23          Secondly, there is the summons to attend court to produce specified
24          documents (in the High Court formerly known as a subpoena duces tecum).
25          It is this second type of witness summons which is the subject of this
26          section. Witness summonses in the High Court and County Court are
27          governed by CPR rr.34.1–34.7".

28          "10.05 Non-party disclosure under CPR r.31.17 will often be

28

1    available as an alternative to a witness summons, albeit their functions are

2    different. Non-party disclosure under CPR r.31.17 is a form of disclosure

3    of documents which may or may not constitute evidence. A witness

4    summons is part of the process of the production of evidence".

5        48.      Ordinarily a recipient of a witness summons is entitled to very limited

6    costs of compliance (conduct money), whereas under CPR r.31.17 the non-party is

7    usually entitled to that non-party's costs of searching, listing and providing copies of

8    documents. This may make the non-party more inclined towards cooperation with a

9    disclosure request.  However, as explained at 10:05, though this course of action may

10   lead to the production of documents as part of the disclosure process, they are not

11   evidence as such and so the person producing them may have to be called at trial

12   following a witness summons.

13       It would be possible for witnesses in England to be deposed and to be required

14   to produce documents in aid of the present proceedings in the Central District of

15   California.  The enabling statute is the Evidence (Proceedings in Other Jurisdictions)

16   Act 1975.  The general principle is recorded in para. 34.21.2 of "The White Book",

17   which is the main guide to the CPR:

18       ""We ought to afford foreign Courts the fullest benefit we can" (per

19       Cockburn CJ in *Desilla v Fells & Co* (1879) 40 LT. 423 at 424). It is the

20       duty and the pleasure of the English court to do all it can to assist the foreign

21       court, just as the English court would expect the foreign court to help it in

22       like circumstances (see, per Lord Denning MR in *Rio Tinto Zinc Corp v*

23       *Westinghouse Electric Corp* [1978] A.C. 547 at 560; [1977] 3 All E.R. 703

24       at 708).  However, [White Book, para. 34.21.2] "the English court will in

25       its discretion refuse to order an expert to give evidence against their wishes

26       in a case where they have had no connection with the facts or history of the

27       matter in issue and still less to produce working papers from which they

28       had prepared published articles" and "The English court has power to

29

accept or reject the foreign request in whole or in part, whether as to oral or documentary evidence; and it can and should delete from the foreign request any parts that are excessive either as regards witnesses or as regards documents. The English court will act on the principle that it should salve what it can, but should decline to comply with the foreign request in so far as it is not proper or permissible or practicable under English law to give effect to it".  Specifically, in *Rio Tinto Zinc Corp v Westinghouse Electric Corp* [1978] AC 547 the Master of the Rolls, Lord Denning, stated that the statute "seems to me to exclude what we would call a "fishing inquiry." A witness cannot be required to make a general affidavit of documents. To that extent it excludes pre-trial discovery. Section 2 (4) (b) says that the order shall not require a person:

> "to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power."

> So the only documents which can properly be the subject of an order are "particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in his possession, custody or power."".

49.    Though at first glance it might be supposed that there is identicality, or strong similarity, with the normal process for disclosure in English litigation, I see important differences.

50.    I have been engaged in the process of taking of evidence in aid of foreign proceedings in various cases, including as a witness, as a lawyer asking questions of the witness and as the presiding person.  I perceive a practical difficulty in that the process is remote from the court that is charged with deciding the case.  Many or all of the persons attending such a session are not as engaged or steeped in the facts and issues as they would be at a normal trial.

30

1   Perhaps more important, the person presiding is not a person deciding the case.
2   In a trial in England, the judge is in the courtroom with the witness and so can
3   form an impression from the demeanor of the witnesses.  The judge can, and
4   often will, ask questions of the witness.  In my opinion, in a case where the facts
5   are so important the trier of fact has a real advantage if she has the witnesses in
6   the same courtroom.
7       51.     This leads to another consideration.  The case appears to me to turn
8   on issues of mixed, obscure fact and complex law.  I believe that trial in the
9   Chancery Division by a judge familiar with English law and culture and able to
10  test in courtroom discussion with the parties' specialist advocates the arguments
11  they advance would provide the optimal opportunity to resolve so English a
12  dispute.  I would add that the process by which the court allots judges for trials
13  in England requires the parties to stipulate the complexity of the case and
14  therefore the level of judge that they think the trial requires.  This means that in
15  England one can be confident that the court can readily decide what level of
16  complexity and what kind of experience (copyright) is needed.
17      52.     In any event, I believe that it would be more economical and
18  speedy and far less cumbersome to have the case tried in England.
19
20  I declare under penalty of perjury under the laws of the United States that the
21  foregoing is true and correct.
22
23  Executed this 5th day of August, 2021 at London, England, United Kingdom.
24
25  _____
26                    Michael Skrein
27
28

DECLARATIONS OF MARK S. LEE, MICHAEL SKREIN, ALEXANDER KLETT AND JOHN SILVA
IN SUPPORT OF NIRVANA'S MOTION TO DISMISS

## DECLARATION OF DR. ALEXANDER RODERICH ARNULF KLETT

I, Dr. Alexander Roderich Arnulf Klett, declare:

1.     I am a Rechtsanwalt (attorney) in Germany, admitted in 1999.  I joined Reed Smith LLP in its Munich office as a partner in the Intellectual Property Group in 2008. An area of legal work in which I have worked extensively is copyright law. My doctoral dissertation was about comparative German and US copyright law. I attach to this report as Exhibit 10 a short *curriculum vitae*.

2.     I have read the complaint in this matter dated 28 April 2021 and Exhibits 1-16 thereto. I make this declaration in order to assist the court on certain matters of the copyright law of the Federal Republic of Germany.

3.     The Plaintiff states [Complaint ¶ 67] that the Illustration is copyrightable subject matter for which copyright protection exists in Germany under the German Copyright and Neighboring Rights Act of 1965 (the "UrhG"). Plaintiff further states that as the exclusive owner of the copyright in and to the Illustration, she can file suit in the U.S. against the Defendants for their infringing activities in Germany.

4.     The Plaintiff also states [Complaint, ¶ 69] that she is entitled to relief under § 823 of the German Civil Code ("BGB"), and to the remedies stated in Section 97 of the UrhG – which include injunctive relief as well as damages in the form of either (a) disgorgement of the profits that Defendants obtained from the infringing conduct, (b) the reasonable compensation that Defendants would have owed to Plaintiff for the use of the Illustration, had they obtained her permission, or (c) restitution under general principles of unjust enrichment (§ 812 BGB), in an amount to be proven at trial.

5.     The claim that the Plaintiff is the exclusive owner of the copyright in and to the Illustration for German law purposes is not a straightforward matter to decide and requires a careful analysis under German copyright law.

6.     Furthermore, the claims made by the Plaintiff in the complaint regarding entitlement to relief under German law are not fully accurate.

32

## APPLICABILITY OF GERMAN COPYRIGHT LAW TO PLAINTIFF'S CLAIMS RELATING TO ALLEGED INFRINGEMENTS IN GERMANY

7.      The alleged claims brought by the Plaintiff with respect to purported infringements within the territory of the Federal Republic of Germany are governed by German copyright law, namely by the current German Copyright and Neighboring Rights Acts of September 9, 1965. The fact that the Plaintiff and the alleged author of the Illustration are both UK citizens means that German copyright law applies to them with respect to alleged claims concerning Germany. The sole requirements for the application of current German copyright law are that the work was still protected in the country of origin on January 1, 1966 and that the country of origin became an EU member state at some point. The United Kingdom became a member state of the EU on January 1, 1973. This means that from this time onwards the principle of non-discrimination (now in Section 120 UrhG) applied under EU and German copyright law for the benefit of all UK citizens. The principle of non-discrimination under German case law and that of the Court of Justice of the EU ("CJEU") means that all citizens of other member states need to be treated fully like German citizens under German copyright law, even if they died before their home country became an EU Member State (see: CJEU, judgment of June 6, 2002, case C-360/00 – *Land Hessen v. Ricordi*). In this decision, at para. 31, the CJEU held:

> "Although it is undisputed that the first paragraph of Article 6 of the EC Treaty is not concerned with any disparities in treatment or the distortions which may result, for the persons and undertakings subject to the jurisdiction of the Community, from divergences existing between the laws of the various Member States, so long as those laws affect all the persons subject to them, in accordance with objective criteria and without direct or indirect regard to nationality, it does prohibit 'any discrimination on grounds of nationality'. Consequently, that provision requires each Member State to ensure that nationals of other Member States in a situation

33

1  governed by Community law are placed on a completely equal footing with

2  its own nationals (see, to that effect, *Phil Collins and Others*, cited above,

3  paragraphs 30 and 32)."

4      In this regard it was thus possible that copyright could be

5  "resurrected" in Germany because in the case at issue Puccini's works (who

6  died in 1925, long before the EU had been created) happened to have fallen

7  into the public domain in his native Italy already, while German authors

8  were still protected under German copyright law in Germany (see: CJEU,

9  *loc. cit.*, and see Klett, Puccini und kein Ende, GRUR Int. 2001, 810;

10  Flechsig/Klett, Diskriminierungsverbot, ZUM 2002, 732).

11      8.    The United Kingdom has now left the EU. As of January 1, 2021 the UK

12  is no longer an EU Member State. The relationship between the UK and the EU is now

13  governed by the Trade and Cooperation Agreement ("TCA") between the European

14  Union and the European Atomic Energy Community, of the one part, and the United

15  Kingdom of Great Britain and Northern Ireland, of the other part (Official Journal of

16  the European Union No. L149/10 of April 30, 2021). Title V of the TCA governs

17  Intellectual Property. Under Art. 224 TCA the following applies:

18      "1. In respect of all categories of Intellectual Property covered by

19  this title, each Party shall accord to the nationals of the other Party

20  treatment no less favorable than the treatment it accords its own nationals

21  with regard to the protection of Intellectual Property subject were

22  applicable to the exceptions already provided for in, respectively, the Paris

23  Convention, the Berne Convention, the Rome Convention and the Treaty

24  on Intellectual Property in Respect of Integrated Circuits, done at

25  Washington on 26 May 1989. In respect of performers, producers of

26  phonograms and broadcasting organizations, this obligation only applies in

27  respect of the rights provided for under this Agreement.

28      2. For the purposes of paragraph 1 of this Article "protection" shall

<div align="center">34</div>

include matters affecting the availability, acquisition, scope, maintenance, and enforcement of Intellectual Property Rights as well as matters affecting the use of Intellectual Property Rights specifically addressed in this Title, including measures to prevent the circumvention of effective technological measures as referred to in Article 234 and measures concerning rights management information as referred to in Article 235."

Consequently, the non-discrimination obligation under EU law still applies in relation to UK citizens but has been replaced by Art. 224 TCA. UK authors therefore continue to enjoy equal treatment in Germany to German authors. As per the definition in Art. 224 (2) TCA German law governs all questions in relation to a copyright claim concerning German territory by UK citizens including the availability, acquisition, scope, maintenance and enforcement of Intellectual Property rights. Therefore, the question of copyright ownership for claims relating to Germany is to be analyzed and defined under German copyright law only. For purposes of alleged infringement in Germany a work will be treated like a domestic German work even if it was (allegedly) created by a citizen from another EU member state or, in this case, the UK as a former member (because of the provision in the TCA).

As I will explain the analysis of the validity of the claims brought by the Plaintiff under German copyright law is quite complex. It is for this reason that copyright law cases in Germany are almost exclusively handled by special courts and special divisions for copyright law matters in these courts.

## THE COPYRIGHT AND NEIGHBORING RIGHTS ACT OF 1965 (URHEBERRECHTSGESETZ) – THE "URHG"

9.      The current German Copyright Act is the Copyright and Neighboring Rights Act of September 9, 1965, in force since January 1, 1966, as amended (Urheberrechtsgesetz – the "UrhG").

10.      Section 7 UrhG provides: "Urheber ist der der Schöpfer des Werkes." ("The author is the person who creates the work.").

11.      Section 8 UrhG provides:

(1)      "Haben mehrere ein Werk gemeinsam geschaffen, ohne dass sich ihre Anteile gesondert verwerten lassen, so sind sie Miturheber des Werkes.

(2)      Das Recht zur Veröffentlichung und zur Verwertung des Werkes steht den Miturhebern zur gesamten Hand zu; Änderungen des Werkes sind nur mit Einwilligung der Miturheber zulässig. Ein Miturheber darf jedoch seine Einwilligung zur Veröffentlichung, Verwertung oder Änderung nicht wider Treu und Glauben verweigern. Jeder Miturheber ist berechtigt, Ansprüche aus Verletzungen des gemeinsamen Urheberrechts geltend zu machen; er kann jedoch nur Leistung an alle Miturheber verlangen."

In English:

"(1) If several persons created a work jointly and their shares in the work cannot be exploited separately, they are joint authors of the work."

(2) Joint authors are jointly entitled to the right of dissemination and to exploitation rights in the work; alterations to the work shall only be admissible with the approval of the joint authors. However, contrary to good faith, a joint author may not refuse his approval for dissemination, exploitation or alteration. Each joint author is entitled to assert claims arising from infringements of the joint copyright. However, a joint author

36

asserting such claims may only demand compensation for all joint authors."

12.   Section 10 UrhG provides:

"(1) Wer auf den Vervielfältigungsstücken eines erschienenen Werkes oder auf dem Original eines Werkes der bildenden Künste in der üblichen Weise als Urheber bezeichnet ist, wird bis zum Beweis des Gegenteils als Urheber des Werkes angesehen; dies gilt auch für eine Bezeichnung, die als Deckname oder Künstlerzeichen des Urhebers bekannt ist.

(2) Ist der Urheber nicht nach Abs. 1 bezeichnet, so wird vermutet, dass derjenige ermächtigt ist, die Rechte des Urhebers geltend zu machen, der auf den Vervielfältigungsstücken des Werkes als Herausgeber bezeichnet ist. Ist kein Herausgeber angegeben, so wird vermutet, dass der Verleger ermächtigt ist."

In English:

"(1) Anyone who has been designated as the author of a work in a customary way on the copies of a published work or on the original of an artistic work shall be deemed to be the author of the work until evidence to the contrary has been provided. This shall also apply to a designation which is known as the synonym of the artist's mark of the author.

(2) If there is no designation of the author as referred to in subsection 1, it shall be presumed that the person designated as the editor on the copies of the work is authorized to assert the rights of the author. If no editor is designated it shall be presumed that the publisher is authorized to assert the rights of the author."

13.   Section 29 UrhG provides:

"(1) Das Urheberrecht ist nicht übertragbar, es sei denn, es wird in Erfüllung einer Verfügung von Todes wegen oder an Miterben im Wege der Erbausei-nandersetzung übertragen.

(2) Zulässig sind die Einräumung von Nutzungsrechten (§ 31 ), schuld-

37

1  rechtliche Einwilligungen und Vereinbarung zu Verwertungsrechten sowie

2  die in § 39 geregelten Rechtsgeschäfte über Urheberpersönlichkeitsrechte."

3       In English:

4  "(1) Copyright is not transferable unless it is transferred in the course of

5  the fulfilment of the disposition causa mortis or unless it is transferred to

6  co-heirs by way of the settlement of an estate.

7   (2) The granting of exploitation rights (§ 31), approval under the law of

8  obligations, agreements with regard to exploitation rights and the legal

9  transactions with respect to moral rights of an author regulated under § 39

10  shall be admissible."

11  14.     And section 43 UrhG provides:

12       "Die Vorschriften dieses Unterabschnitts sind auch anzuwenden,

13  wenn der Urheber das Werk in Erfüllung seiner Verpflichtungen aus einem

14  Arbeits- oder Dienstverhältnis geschaffen hat, soweit sich aus dem Inhalt

15  oder dem Wesen des Arbeits- oder Dienstverhältnisses nichts Anderes

16  ergibt."

17       In English:

18       "The provisions of this subchapter shall also apply if the author has

19  created the work in performance of his duties under a contract of

20  employment or service unless the content or the nature of the contract of

21  employment or service requires otherwise."

22  15.     The Plaintiff claims [Complaint, ¶ 67] that she is the exclusive owner of

23  the copyright in and to the Illustration. She claims to be the sole heir to Mr. Scott-Giles

24  [Complaint, ¶14], though the Complaint does not contain proof of this. The Plaintiff

25  further claims [Complaint, ¶ 16] that Mr. Scott-Giles drew the Illustration in or about

26  1949 to accompany an English translation of the first volume of the Dante Trilogy by

27  his close friend Dorothy L. Sayers. The Complaint does not contain further details

28  around this, such as the question as to whether Mr. Scott-Giles truly drew the

38

Illustration completely independently and on his own or whether it was drawn in a joint creative effort with Ms. Sayers, whether Mr. Scott-Giles was self-employed at the time or employed by a third party, whether he was under what might be construed as a contract of service with Ms. Sayers at the time the Illustration was allegedly drawn and whether he was compensated by Ms. Sayers or a third party (an employer) for having drawn the Illustration. If this litigation was before a German court all these questions would be looked at very critically by the court and the plaintiff would have the full burden of proof (with no discovery available under German civil procedure) to convince the court that all of the requirements for a valid claim for injunctive relief and damages under German copyright law exist in the plaintiff.

### OWNERSHIP OF COPYRIGHT BY THE PLAINTIFF

16.     In order for the Plaintiff to successfully bring the claims in question under German copyright law a German court would look, first of all, at whether the Plaintiff provided proper proof of ownership to the work at issue in this matter, i.e. the Illustration allegedly created by Mr. Scott-Giles. She does not claim to be the original author of the work under Section 7 of the UrhG. The assumption in Section 10 of the UrhG would also not work in her favour.

17.     Consequently, she can only successfully claim to be the owner of the copyright to the Illustration if she can prove that she is indeed, as she claims, the sole heir to Mr. Scott-Giles. Whether this is the case is a question of German law. See, for example, the decision by the Düsseldorf Court of Appeals of April 24, 2007 (I-20 U 175/06, published in: ZUM-RD 2007, 465) which states:

> "Vorab ist zu beachten, dass auf die hier streitigen Fragen der Rechteinhaberschaft deutsches Recht zur Anwendung kommt. Kollisionsrechtlich ist diese Frage nach den Regeln des internationalen Immaterialgüterrechts zu lösen, das bei auslandsbezogenen Sachverhalten heranzuziehen ist. Grundlage für die Zuordnung ist nach nahezu einhelliger Meinung das Recht des Schutzstaates, d.h. das Recht des Staates, für dessen

1   Gebiet Immaterialgüterrechtsschutz in Anspruch genommen wird (siehe

2   BGHZ 118, 394, 397 f. = ZUM 1993, 187 – ALF; BGH-GRUR 1994, 798

3   – Folgerecht bei Inlandsbezug). Immaterialgüterrechte sind ihrer Geltung

4   räumlich auf das Territorium des Staates begrenzt, der sie individuell

5   verleiht oder unter bestimmten Voraussetzung generell anerkennt. Das

6   Schutzlandrecht bestimmt sowohl über das Entstehen als auch über Inhalt

7   und Bestand des Urheberrechts (OLG Hamburg GRUR 1979, 235, 237 –

8   ARRIVAL; OLG Karlsruhe GRUR 1984, 521, 522 – Atari-Spielcasetten).

9   Nach dem Schutzlandprinzip, angelegt in Art. 5 Abs. 2 S. 2 der revidierten

10  Berner Übereinkunft, richtet sich auch die Frage der ersten Inhaberschaft

11  sowie die Übertragbarkeit des Urheberrechts (BGHZ 136, 380, 387 =

12  ZUM-RD 1997, 546 – Spielbankaffaire; OLG München ZUM 1999, 653 –

13  Rechte am Drehbuch zu „M" (...)).

14      Diese Anknüpfungsregeln kommen auch zum Tragen, wenn es um

15  die urheberrechtliche Bestimmung der Rechtsinhaberschaft im Wege der

16  Erbfolge geht. Für sämtliche Verfügungen im Testament gilt zwar

17  grundsätzlich das Erbstatut, welches sich nach der Staatsangehörigkeit des

18  Erblassers richtet, Art. 25 EGBGB. Das Erbstatut entscheidet über Fragen

19  der Erbfähigkeit, der Einsetzbarkeit eines Erben, Bestimmung der

20  gesetzlichen Erben, Erwerb und Verlust der Erbenstellung und Fragen der

21  Vor- und Nacherbschaft (Kegel / Schurig, IPR 8. Aufl., § 21 II). Ob ein

22  beim Tode vorhandenes Aktivum oder Passivum dem Erblasser gehörte

23  bzw. ob es auf den Erben übertragen werden kann, ist eine Vorfrage, die

24  selbstständig anzuknüpfen ist. Es entscheidet dann das Einzelstatut bzw.

25  die Rechtsordnung, die das Aktivum oder Passivum beherrscht (Kegel /

26  Schurig, IPR, 8. Aufl., § 21 II). Führt das Schutzlandprinzip zur

27  Anwendung des deutschen Rechts, so ist die entscheidende Frage, ob § 29

28  UrhG dogmatisch dem Erbrecht oder dem Urheberrecht zuzuordnen ist.

40

1   Inhaltlich befasst sich § 29 Abs. 1 UrhG zwar mit der Übertragung des
2   Urheberrechts durch eine Verfügung von Todes wegen. Dogmatisch
3   besteht jedoch Einigkeit, dass § 29 Abs. 1 UrhG als eine Regel des
4   Urheberpersönlichkeitsrechts in weiterem Sinne aufzufassen ist (Schricker
5   / Schricker, UrhG, 3. Aufl., § 29 Rn. 4). Der Grundsatz der Unübertrag-
6   barkeit des Urheberrechts zu Lebzeiten des Urhebers ergibt sich aus der im
7   deutschen Recht vorherrschenden monistischen Auffassung des
8   Urheberrechts. Die Frage nach der Übertragbarkeit ist somit eine Frage des
9   Urheberrechtsstatus, nicht des Erbstatus (OLG München ZUM 1999, 53,
10  656; Wandtke / Bullinger 2. Aufl., §§ 120 Rn. 4)."

11      In English:

12      "It has to be noted first of all that German law applies to the questions
13  regarding ownership of rights at issue here. From a conflicts of law
14  perspective this question has to be resolved according to the rules on
15  international Intellectual Property Law which has to be applied in scenarios
16  regarding foreign countries. The basic rule for the application according to
17  almost unanimous opinion is the law of the country of protection, i.e. the
18  law of the country for the territory of which Intellectual Property Law
19  protection is claimed (see German Federal Supreme Court BGHZ 118, 394,
20  397 f. published in ZUM 1993, 187 – ALF; German Federal Supreme Court
21  GRUR 1994, 798 – Droit de Suite with domestic connection). Intellectual
22  Property Rights are limited in their geographic application to the territory
23  of the country which grants them individually or which acknowledges them
24  as a general matter under certain circumstances. The law of the country of
25  protection governs both the genesis as well as the content and existence of
26  the copyright (Hamburg Court of Appeals GRUR 1997, 235, 237 – Arrival;
27  Karlsruhe Court of Appeals GRUR 1984, 521, 522 – Atari-game cassettes).
28  The principle of the country of protection, which is provided for in Art. 5

41

(2) second sentence of the Revised Berne Convention, also governs the question of first ownership as well as the assignability of copyright (German Federal Supreme Court BGHZ 136, 380, 387 published in ZUM – RD 1997, 546 – Spielbankaffaire; Munich Court of Appeals ZUM 1999, 653 – Rights to the script for "M" (…)).

These rules of application also apply in cases concerning the definition under copyright law of the ownership of rights by way of inheritance. The applicable law of inheritance will generally apply for all legal dispositions in a will, and this depends on the country of citizenship of the deceased individual, Art. 25 EGBGB (Introductory Code to the German Civil Code). The law of inheritance will decide on questions of ability to inherit, ability to make somebody an heir, definition of legal heirs, acquisition and loss of the position of an heir and questions regarding preferential inheritance and subsequent inheritance (see Kegel / Schurig, IPR, 8th edition, § 21 II). Whether a claim / property or debt belonged to the deceased person and whether it can be transferred to the heir is a preliminary question which needs to be determined separately for purposes of the applicable law. In this case the individual statute or the respective domestic law which governs the property or debt will be decisive (see Kegel / Schurig, IPR, 8th edition, § 21 II). If the principle of the country of protection leads to the application of German law the decisive question is whether Section 29 UrhG falls into the law of inheritance or into copyright law dogmatically. In terms of content Section 29 (1) UrhG deals with the transfer of copyright by way of a disposition *causa mortis*. Dogmatically, however, there is agreement that Section 29 (1) UrhG has to be viewed as a rule of moral rights in a wider sense (Schricker / Schricker, UrhG, 3rd edition, § 29 para. 4). The basic principle of the unassignability of copyright while the author is alive results from the dominant monistic

42

perception of copyright law in German law. The question of transferability, therefore, is a question of the applicable copyright law and not of the applicable law of inheritance (Munich Court of Appeals, ZUM 1999, 653, 656; Wandtke / Bullinger, 2nd edition, introduction to §§ 120 et seq. para. 4)."

18.    With respect to the present scenario this means that in order to determine whether the Plaintiff can validly claim to be the copyright owner an analysis under Section 29 UrhG needs to be undertaken with full burden of proof on the Plaintiff.

19.    The complaint does not provide any of the information or documentation a German Court would need to evaluate copyright ownership under German law. A German Court likely would dismiss the complaint in the present matter for lack of any proof in the complaint or the exhibits that the plaintiff is actually, as she claims, the owner of the copyright to the contested Illustration  Since I don't know what evidence Ms. Bundy has to support her copyright ownership claims, I can't advise how difficult or easy it would be for a German Court to evaluate that issue.  I would characterize this as a complex issue for that reason.

### AUTHORSHIP BY MR. SCOTT-GILES

20.    Section 10 UrhG provides for a presumption according to which an individual designated as the author of a work in the customary way on the copies of a published work shall be deemed to be the author of the work until evidence to the contrary has been provided.

21.    Here, Dorothy L. Sayers is identified as the author of the book, and I understand that a copyright notice identifying her alone as author of the book including the illustrations within it, was included in U.S. publications of the book, while all editions also credit Ms. Scott-Giles with the illustrations in the book. However, I also understand that in a series of letters, translator Dorothy L. Sayers states that she drew original drawings that became the illustrations in the book, and that Mr. Scott-Giles was engaged because of his skill in inking and lettering Ms.

43

1  Sayers' pencil drawings.  In these circumstances a German Court would have to
2  undertake an analysis in the present case whether based on the reference to Mr. Scott-
3  Giles in copies of the book in question he can be presumed to be the author of the
4  Illustration. And whether, despite his name being mentioned, the fact that Ms. Sayers
5  is also mentioned as an author of the translation makes the two of them joint authors
6  within in the meaning of Section 8 UrhG. According to the leading commentary on the
7  UrhG by Dreier / Schulze, the following applies:

8  "**Mehrere Personen**. Sind mehrere Personen angegeben, wird
9  vermutet, dass diese Personen als Miturheber tätig waren. Wer die
10  Alleinurheber-schaft in Anspruch nehmen will, muss dies beweisen.
11  Letzteres gilt auch für den Umfang der Mitwirkung an dem zusammen
12  geschaffenen Werk (§ 8 Abs. 3; OLG Hamburg Schulze OLGZ 207,6;
13  Schricker / Loewenheim / Loewenheim / Peifer Rn. 2). Für die
14  Miturheberschaft ist nicht erforderlich, dass jede Person an allen
15  schöpferischen Elementen mitgewirkt hat. Auf den Umfang und die Größe
16  der einzelnen Beiträge kommt es deshalb nicht an, sofern sie nur
17  schöpferischer Art sind (BGH GRUR 1994, 39, 40 –
18  Buchhaltungsprogramm). Fehlen weitere Angaben, wird vermutet, dass die
19  Personen gleichberechtigte Schöpfer des Werkes oder der verbundenen
20  Werke sind (BGH GRUR 1986, 887, 888 – BORA BORA)."

21  In English:

22  "**Several persons**. If several persons are mentioned it is presumed
23  that these persons are joint authors. The individual who wants to claim sole
24  authorship has the obligation to prove this. This also applies with respect
25  to the share in the cooperation for the jointly created work (§ 8 (3);
26  Hamburg Court of Appeals Schulze OLGZ 207, 6; Schricker / Loewenheim
27  / Loewenheim / Peifer para. 2). It is not required for joint authorship that
28  each individual contributed to all creative elements. The extent and the

amount of the individual contributions is therefore not relevant provided that they are of a creative nature (Federal Supreme Court GRUR 1994, 39, 40 – Accounting program). If there are no further indications it is presumed that the individuals are equal creators of the work or the composite works (Federal Supreme Court GRUR 1986, 887, 888 – BORA BORA)."

(Dreier / Schulze, UrhG, 6th edition, 2018, Section 10 para. 24)

22.    If it turns out that Ms. Sayers actually did an initial drawing of the Illustration and Mr. Scott-Giles then only retraced the Illustration the complex question to be reviewed under German copyright law would arise whether the initial drawing is the sole act of creation (creative effort) whereas the retracing is purely mechanical (not creative). That would raise a question as to whether Mr. Scott-Giles' contributions were sufficiently creative or original to qualify for copyright protection under German law. This could lead to a finding, irrespective of the designation on the copies of the published work, that the presumption does not apply, and Ms. Sayers is to be regarded as the sole author also of the Illustration for present purposes.

23.    If it turned out that there was joint authorship for present purposes the plaintiff (assuming all other requirements for a valid claim were present) could only request payment to the authors jointly, not to herself alone (Section 8 (2) UrhG). If the result of the analysis was that the sole creative effort was made by Ms. Sayers the alleged claims by the Plaintiff would have to fail. As answering this question would require a better knowledge of the underlying facts than we presently have, and application of those facts to the German law principles I mentioned above, I believe these are complex issues under German law.

**RIGHTS OF USE AND EXPLOITATION TO THE ILLUSTRATION UNDER GERMAN COPYRIGHT LAW**

24.    For the claims brought by the Plaintiff to be successful under German copyright law, however, the status of authorship of Mr. Scott-Giles, as claimed by the Plaintiff, is not decisive or sufficient. Even if Mr. Scott-Giles was found, after an

45

analysis under German copyright law, to be the (sole or joint) author of the Illustration and if the Plaintiff was indeed the sole heir of Mr. Scott-Giles there would be no claims for the Plaintiff if the rights of use and exploitation had passed from the author to another Party. Under Section 29 (2) UrhG the grant of rights of use and exploitation is expressly allowed. Section 31 UrhG specifies that an author may grant another Party the right to exploit a work in individual or in all forms of exploitation, that the exploitation right may be granted as a non-exclusive or as an exclusive right, and that it may be restricted geographically, in time or content. [1] Furthermore, as explained above, section 43 UrhG provides that the respective provisions of the German Copyright Act also apply if the author has created the work in performance of his duties under a contract of employment or service unless the content or the nature of the contract of employment or service requires otherwise.

25.    The court would need to determine, therefore, first of all, whether grants of use and exploitation may have been given by Mr. Scott-Giles (if he is found to be the author of the Illustration) to a third Party by written or oral agreement (with the exception of rights of use which are still unknown). Rights of use and Rights of exploitation can be granted without any form requirement even orally or tacitly (see: Dreier / Schulze, UrhG, § 31 para. 22 with reference to Frankfurt Court of Appeals ZUM-RD 2015, 100, 104 – Landeswappen).

26.    Separately from this, and even if there were no such grants, it would need to be considered under Section 43 UrhG whether Mr. Scott-Giles may have been in a situation in which he created the work in performance of his duties under a contract of employment or service. If this was the case it would need to be checked whether the content or nature of such contract of employment or service means that the rights of

---

[1] § 31 (1) UrhG: „Der Urheber kann einem anderen das Recht einräumen, dass Werk auf einzelne oder alle Nutzungsarten zu nutzen (Nutzungsrecht). Das Nutzungsrecht kann als einfaches oder ausschließliches Recht sowie räumlich, zeitlich oder inhaltlich beschränkt eingeräumt werden."

46

use and exploitation passed to the other Party of this agreement, possibly Ms. Sayers or the publisher. German copyright law does not have a "work made for hire" doctrine, but for purposes of the question who is entitled to the rights of use or exploitation the analysis under section 43 UrhG needs to be undertaken. In this regard Dreier / Schulze explain:

"**Verpflichtung zur Einräumung von Nutzungsrechten**. Aus arbeits- wie auch aus beamtenrechtlicher Sicht steht das Arbeitsergebnis dem Arbeit- bzw. dem Dienstgeber zu. Das gilt auch für Urheberrechte, die der Arbeit- oder Dienstnehmer in Erfüllung seiner Verpflichtungen aus einem Arbeits- oder Dienstverhältnis erworben hat. Da die Urheberrechte jedoch nicht automatisch auf den Arbeitgeber bzw. Dienstherren übergehen, ist der angestellte bzw. verbeamtete Urheber also zur Einräumung dieser Urheberrechte verpflichtet; die Einräumung selbst, die zumeist ein ausschließliches Nutzungsrecht betrifft (OLG Karlsruhe GRUR – RR 2013, 423 – Zwölffamilienhaus), bedarf zusätzlich der Verfügung…

**Art und Zeit der Einräumung**. Die Verpflichtung zur Einräumung der Nutzungsrechte kann entweder ausdrücklich erfolgen (ausdrückliche Regelung im Arbeits- oder Dienstvertrag, tarifvertragliche Regelung, vgl. dazu die umfassende Zusammenstellung bei Wandtke / Bullinger / Wandtke Rn. 121 ff., oder besondere, zusätzliche Vereinbarungen) oder aber sich stillschweigend aus dem Arbeits- oder Dienstvertrag ergeben (vgl. BGH GRUR 2011, 59 Rn. 11 – Lärmschutzwand; GRUR 1974, 480, 483 – Hummelrechte; OLG Karlsruhe GRUR-RR 2013, 423 – Zwölf-familienhaus; Schricker / Loewenheim / Rojahn Rn. 40 mwN) … Die Einräumung der Nutzungsrechte erfolgt im Sinne der überwiegenden Interessen des Arbeitgebers bzw. Dienstherren – die damit vor einer späteren Verletzung arbeits- oder dienstvertraglicher Pflichten durch den

47

Arbeit- oder Dienstnehmer geschützt sind – regelmäßig im Wege der Vorausverfügung über die Nutzungsrechte bereits bei Abschluss des Arbeits- oder Dienstvertrages, spätestens jedoch – und sei es stillschweigend (Bundesverwaltungsgericht BVerwG GRUR-RR 2016, 137 Rn. 40 – Dokumentation für zu Guttenberg) – bei Übergabe des Werkes.“

In English:

"**Obligation to grant rights of use**. From an employment law perspective as well as regarding the law governing civil servants the work product belongs to the employer or principal. This also applies with respect to copyrights which the employee or provider of services under a contract of service obtained in fulfilment of his obligations under the agreement. As the copyrights do not transfer automatically to the employer or principal the employed author (or civil servant as an author) has an obligation to grant these copyrights; the grant itself concerns an exclusive right of use in most cases (Karlsruhe Court of Appeals GRUR-RR 2013, 423 – Zwölffamilienhaus) also requires a legal disposition (…)

**Type and time of grant**. The obligation to grant the rights of use can either be expressly spelled out (express permission in the contract of employment or service, provision in a collective agreement, cf. the comprehensive listing in Wandtke / Bullinger / Wandtke para. 121 et. seq. or express further agreement) or result from the contract of employment or service (cf. German Federal Supreme Court GRUR 2011, 59 para. 11 – Lärmschutzwand; GRUR 1974, 480, 483 – Hummelrecht; Karlsruhe Court of Appeals GRUR-RR 2013, 423 – Zwölffamilienhaus; Schricker / Loewenheim, Rojahn para. 40 with further references) ….

The grant of the rights of use regularly takes place by advance disposition regarding the rights of use at the time the employment or service

48

agreement is concluded – taking into account the prevailing interests of the employer or principal who will then be protected against a later violation of obligations under the employment agreement or service agreement by the employee or a service provider. At the latest, however, the grant will take place even tacitly (Federal Administrative Court GRUR-RR 2016, 137 para. 40 – Dokumentation für zu Guttenberg) - once the work is handed over."

27.     An analysis therefore needs to be undertaken under German copyright law for the present purposes as to whether Mr. Scott-Giles may effectively have been in a service provider relationship under a contract of service or a contract of employment with Ms. Sayers. If this was the case it would then have to be decided whether he granted the exclusive rights of use and exploitation to the Illustration to Ms. Sayers in line with Sections 31, 43 UrhG. This requires a complex analysis because not only the grant as such, but also the scope or extent of the grant needs to be defined if there is no express written provision in the contract of employment or service. Dreier / Schulze explain that the so-called rule of the scope of the grant depending on the individual aim applies to tacit grants in employment or service relationships as well. The scope of the grant will have to be sufficient to take into account the legitimate interests of the employer or principal (Dreier / Schulze, UrhG, § 43 para. 20). The exact definition of such scope in an individual case requires a diligent review by the court.

**RELIEF CLAIMED BY PLAINTIFF UNDER GERMAN COPYRIGHT LAW**

28.     In order to be able to claim relief under German copyright law Plaintiff would need to specifically show and substantiate acts of infringement of Copyright within the territory of the Federal Republic of Germany. The complaint lacks any such substantiation. The plaintiff merely alleges [Complaint, ¶ 33] that the bulk of the infringing activities of the Defendants outside of the U.S. "appears to be concentrated in the United Kingdom and Germany". The Plaintiff continues by saying [Complaint,

¶ 39]: "On information and belief, Defendants are infringing upon Plaintiff's German copyright in the Illustration by licensing, manufacturing, marketing, selling and / or distributing the Infringing Products in Germany without Plaintiff's consent…"

29.     A German court would immediately dismiss a complaint alleging copyright infringement without the slightest substantiation as in the complaint in the present case. Claims need to be substantiated. With respect to copyright infringement claims this means that the Plaintiff needs to show and demonstrate the actual cases of infringement of the copyright within the Federal Republic of Germany which the claims are supposed to be based upon. The Plaintiff would need to expressly state which test purchases were undertaken of allegedly infringing products in Germany, which advertising or other marketing activities the Defendants conducted in Germany, to what extent the works in question may have been reproduced, distributed or otherwise used by the Defendants in Germany. All of these specific Acts of Infringement would not only need to be stated, but also documented for purposes of proof. Instead of bringing properly substantiated claims before the competent German courts the plaintiff appears to attempt to go on a fishing expedition before a U.S. court which is not only geographically remote but also cannot be expected to have the legal expertise with respect to the complex structure of German copyright law applicable to the matter at issue here.

30.     With respect to the relief sought by the plaintiff under German copyright law [Complaint, ¶ 69] the structure is not correct. If the plaintiff had claims for infringement of German copyright law the claims would be based on section 97 of the UrhG as the specialised norm (*lex specialis*) which leaves very little room (and no room in the present normal infringement scenario) for separate relief under the general tort law provision in § 823 of the German Civil Code (BGB).

31.     Section 97 of the UrhG includes injunctive relief and damages as the complaint states [Complaint, ¶ 69]. However, the three possible options for damages claimed are not stated correctly in the complaint. They are: a) disgorgement of the

50

profits that Defendants obtained from the alleged infringing conduct, b) compensation of the profits lost by the Plaintiff due to the infringing conduct or, c) the reasonable compensation (reasonable license fee) that Defendants would have owed to plaintiff for the use of the Illustration, had they obtained her permission.

32.     Alternative claims under general principles of unjust enrichment (§ 812 BGB) are possible in theory, but almost completely irrelevant in practice (see: Dreier / Schulze, UrhG, § 102 a para. 7). I have never been involved in Copyright infringement litigation in which claims for unjust enrichment were brought or discussed by the court instead of damages claims under Section 97 UrhG

33.     I strongly believe that both the complex determination of legal requirements for the claims at issue here, the application of the facts before the court to the provisions of German copyright law which the Plaintiff seeks relief under as well as the determination of the scope of possible relief, if any, under German copyright law is going to be significantly easier and more appropriately done by the respective specialized section of the competent German court handling copyright litigation matters. Within the German court system there is a concentration for Intellectual Property Law matters with particular courts in each state. This applies to the different areas of Intellectual Property Law. With respect to copyright law Section 105 UrhG provides that the German states may define certain courts as competent courts for copyright law litigation matters. And within the specific courts specialized sections for copyright law litigation matters have been set up in the vast majority of German courts (see Dreier / Schulze, UrhG § 105 para. 2 – 5). The concentration of copyright law litigation matters at specialized courts and specialized sections within the respective courts in Germany is due to the complexities and highly specialized nature of copyright law litigation in comparison with general civil or commercial litigation, for example.

34.     I therefore respectfully take the view that a decision regarding the issues of German copyright law raised in the complaint in the present matter should be taken

51

1  within Germany by the specialized competent sections of the relevant German courts

2  appointed to handle German copyright law litigation matters and not – with all due

3  respect to the court – by a court on the West Coast of the United States.

4        I declare under penalty of perjury under the laws of the United States that the

5  foregoing is true and correct.

6        Executed this 6th day of August, 2021 in Munich    .

7

8

9                                Dr. Alexander Klett

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATIONS OF MARK S. LEE, MICHAEL SKREIN, ALEXANDER KLETT AND JOHN SILVA
IN SUPPORT OF NIRVANA'S MOTION TO DISMISS

1

## <u>DECLARATION OF JOHN SILVA</u>

2   I, John Silva, declare:

3   1. I am the owner and principal of Silva Artist Management ("SAM"), a

4 boutique personal management firm specializing in the global careers of

5 independent and influential artists. I have served as an artist manager for over 30

6 years. I originally signed Nirvana in late 1990 and continue to curate and oversee

7 their catalogue and legacy. I have represented each and all of their formal legal

8 entities – first Nirvana Inc. and the band Nirvana, which I understand operated as a

9 partnership, and the current Nirvana, L.L.C. (collectively, "Nirvana"), since 1990.

10 Nirvana, L.L.C. acquired and succeeded to the interests of Nirvana Inc. and Nirvana

11 in 1997.

12   2. I have firsthand, personal knowledge of the facts as stated herein, and if

13 called to testify in Court, I could and would competently testify hereto.

14   3. Nirvana was being courted by a number of major record companies

15 when I began representing them, and in April 1991, the band ultimately signed a

16 recording contract with the David Geffen Company ("Geffen"). The members of

17 Nirvana – Kurt Cobain, Krist Novoselic, and Dave Grohl – collectively and jointly

18 signed the contract as Nirvana.

19   4. Kurt was, in many ways, the architect of how Nirvana was and would

20 be visually presented to the world. Even before signing with Geffen, Kurt had

21 envisioned and created the band's album covers and merchandise designs.  Among

22 the designs was a t-shirt that depicted the "Circles of Hell" from "Dante's Inferno"

23 together with the name "Nirvana" on the front and profane text on the back.

24   5. In early October 1991, Nirvana entered into a merchandising agreement

25 with Giant Merchandising ("Giant"), and Giant began marketing the "Circles of

26 Hell" t-shirt, and other t-shirts and merchandise for Nirvana.

27

28

1      6.    Through various merchandising companies, the various Nirvana

2 entities I mentioned above have continuously sold the "Circles of Hell" t-shirt, as

3 well as other band merchandise with the same design. Live Nation Merchandise,

4 LLC ("Live Nation") is the current company through whom Nirvana most recently

5 sold that t-shirt and merchandise.

6      7.    In February of 2021, I received a letter from an attorney who said she

7 represented Jocelyn Susan Bundy. That letter claimed that Ms. Bundy owned the

8 copyright in the "Circles of Hell" drawing used on the Nirvana t-shirt I described

9 above, and that Nirvana's t-shirt infringed that copyright. I forwarded the letter to

10 Nirvana's counsel for further handling, and I understand they responded. I further

11 understand there was an exchange of several letters between counsel for Nirvana

12 and Ms. Bundy.

13      8.    During the exchange of those letters, although I learned nothing that

14 made me think Nirvana had infringed any copyright, I decided that Nirvana would

15 stop selling the t-shirt and other merchandise with the disputed "Circles of Hell"

16 design, and I directed Live Nation to stop selling such merchandise for that reason.

17 I am informed and believe that all such sales have now stopped.

18      9.    I am informed and believe that Ms. Bundy's present complaint alleges

19 copyright infringement against Nirvana and the other defendants in this action.

20 Nirvana and the other companies with which I am associated would be willing to

21 defend those claims in legal proceedings in the United Kingdom.

22      I declare under penalty of perjury under the laws of the United States that the

23 foregoing is true and correct. Executed this 9th day of August, 2021 in

24 Los Angeles, California

25

26



27 John Silva

28

54

DECLARATIONS OF MARK S. LEE, JOHN SILVA, MICHAEL SKREIN, ALEX KLEET, AND JOEL M. BENNETT ISO NIRVANA'S NOTICE OF MOTION AND MOTION TO DISMISS

149932965

## <u>DECLARATION OF JOEL M. BENNETT</u>

I, Joel M. Bennett, declare:

1.      I am employed by Live Nation Worldwide, Inc. ("Live Nation Worldwide"). Defendants Live Nation Merchandise, LLC ("Live Nation Merchandise") and Merch Traffic LLC ("Merch Traffic") are wholly owned by Merch Nation Holdings, LLC, which is itself owned partially by Merch Holdings LLC and partially by Live Nation Worldwide. I have been employed with Live Nation Worldwide since 2019, and have held the position of Vice President – Finance since that time. My duties in that role include the day-to-day management of the finance department for the merchandising division of Live Nation Merchandise and responsibility for internal and external reporting of merchandising activities.

2.      I have firsthand, personal knowledge of the facts as stated herein, and if called to testify in Court, I could and would competently testify hereto.

3.      Live Nation Merchandise is a party to an agreement with Nirvana, L.L.C. to market Nirvana merchandise. Among the merchandise designs that Live Nation Merchandise has marketed under its agreement with Nirvana, L.L.C. is a design known as the "Vestibule," depicting an illustration of the "Circles of Hell" from "Dante's Inferno," together with the name Nirvana.

4.      Live Nation Merchandise has sold merchandise featuring the "Vestibule" design in the United States, as well as in the United Kingdom, Europe, and other territories. Live Nation Merchandise sells to consumers worldwide through its U.S.-hosted website, https://shop.nirvana.com/. Live Nation Merchandise also has an office in London, England, and through its London office, Live Nation Merchandise sells Nirvana merchandise to retailers and distributors in Europe, including Germany. It engages in no direct-to-consumer sales in Europe.

///

///

///

55

5.     The U.K. and European branch of Live Nation Merchandise's business is run by a team of approximately ten people located in London, England. This team includes a financial director responsible for all financial aspects of Live Nation Merchandise's business in the United Kingdom and Europe and a head of sales who oversees all sales to retailers or distributors located in the United Kingdom and Europe. At least two other Live Nation Merchandise team members in London have been directly involved in the marketing and sale of Nirvana merchandise featuring the "Vestibule" design.

6.     On March 15, 2021, Live Nation Merchandise was contacted by an attorney who said she represented Jocelyn Susan Bundy. The attorney claimed that Ms. Bundy owned the copyright in the "Circles of Hell" drawing used in the "Vestibule" design on Nirvana merchandise, and that Nirvana's merchandise infringed that copyright. Live Nation Merchandise thereafter received instructions from Nirvana, L.L.C to cease all marketing, sales, and distribution of merchandise featuring the "Vestibule" design.

7.     Live Nation Merchandise complied with those instructions. To the best of my knowledge, as of the time of this declaration, Live Nation Merchandise has ceased all sales of merchandise featuring the "Vestibule" design in all territories, including the United States, United Kingdom, and Germany.

///
///
///
///
///
///
///
///
///

DECLARATIONS OF MARK S. LEE, MICHAEL SKREIN, ALEX KLETT, JOHN SILVA AND JOEL M. BENNETT IN SUPPORT OF NIRVANA'S MOTION TO DISMISS

8.      To the best of my knowledge, Merch Traffic has never been involved in the marketing, sale, manufacture, or license of any merchandise featuring the "Vestibule" design.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 6th day of August, 2021 in Westlake Village, Ventura County, California.

Joel M. Bennett

57